UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **NEIL BINDER,**<br>*Plaintiff,*<br>*Pro Se Litigant*<br>*401 East 34th Street*<br>*New York, N.Y. 10016*<br>*(917) 747 3980*<br>*Email: neiljeffreybinder@gmail.com*<br><br>v<br><br>**Capital One Bank N.A.**<br>*Defendant*<br>*Represented by:*<br>*Law Offices of Eduardo Glas P.C.*<br>*345 Seventh Avenue*<br>*New York, N.Y. 10001*<br>*(917) 864-1461*<br>*Email: eglas@gmail.com* | **Pro Se Filing ─ New Case**<br>**─ Fee Paid**<br><br>Complaint |

1

**Jurisdiction:**

1. This dispute involves a New York resident, the pro se litigant PLAINTIFF Neil Binder and an out of state DEFENDANT Capital One Bank with an address at 1680 Capital One Drive, McLean, Virginia. The agreement presented as the basis for the dispute stipulates:

> "…all documents executed in connection [with the Settlement Agreement and Related Documents]…shall be brought solely and exclusively in the State or Federal Courts of New York." [Settlement Agreement, Section 17(f)].

2. Jurisdiction is based on 28 U.S. Code §1332

**Introduction**

3. PLAINTIFF Neil Binder is the debtor on a commercial credit loan owned by DEFENDANT Capital One Bank. A default occurred in February 2015 and the parties entered into a Settlement Agreement on July 18, 2018, calling for monthly payments to reduce the unpaid balance. DEFENDANT asserts that PLAINTIFF later defaulted on the Settlement Agreement which caused the Agreement to become null and void. This caused DEFENDANT to claim that it was entitled to receive the remaining open balance and accumulating interest at 9% from the original default date in 2015. This would compute, as of March 25, 2022, to a balance of $661,010.04.

4. PLAINTIFF asserts that it never defaulted on the Agreement. Hence, the balance remaining when the Agreement expired on December 31, 2021 would be the amount designated in the Settlement Agreement minus all payments made to that date. This would compute to a final balance on March 25, 2022 of $381,005.

5. Therefore, the amount in dispute is the difference of $280,005.

**Background**

6. DEFENDANT issued a Commercial Credit Line Promissory Note to PLAINTIFF on February 1, 2009, for the amount of $1,150,000 [Exhibit A Capital One Promissory Note] which

2

was renewed yearly. In 2014, PLAINTIFF's business was seriously impaired and PLAINTIFF's personal financial condition was also severely affected which caused him to default on the Note in February 2014. DEFENDANT obtained a judgment against PLAINTIFF in March 2015 [Exhibit B Judgment against Binder].

7. At the end of 2014, PLAINTIFF's business was declared insolvent which further compromised PLAINTIFF's financial condition resulting in his continued nonpayment until July 18, 2018, when PLAINTIFF and DEFENDANT entered into a Settlement Agreement. The ending balance outstanding as stated in the Settlement Agreement was $578,236 [Exhibit C Settlement Agreement]. In addition to their signatures, certain other parties signed on the Settlement Agreement as to specific provisions.

8. One additional party was FAWBS Inc. ("FAWBS"). FAWBS is a real estate company that owns various properties in New Jersey. At the time the Settlement Agreement was signed, PLAINTIFF owned 50% of FAWBS outstanding shares and received monthly distributions from the company's net earnings.

9. Another party who executed selected provisions of the agreement was Nina Scerbo ("Scerbo"), who is PLAINTIFF's wife. Scerbo owned a mortgage in the amount of $1,911,470 which was secured by one of the properties owned by FAWBS, an automobile dealership at 3469 Route 46, Parsippany, New Jersey ("Dealership Property").

10. This mortgage was originally placed on the property in 2011 by PLAINTIFF's mother Eleanor Binder [Exhibit D Eleanor Binder mortgage] who then assigned it to Scerbo in 2014 [Exhibit D-1 Assignment to Scerbo].

11. The Dealership Property was rented on October 7, 2014, to Paul Miller Auto Group ("Miller") [Exhibit E Lease and Assignment]. Monthly rent as of October 2019 was $27,500. This

3

rent represented approximately 75% of the total rent received each month by FAWBS from properties it owns.

12. In early 2018, Miller agreed to rent an additional parcel of land located at 65 Cherry Hill Road which abuts the Dealership Property. A lease addendum was executed providing for $5,500 in additional monthly rent [Exhibit F Lease Addendum].

13. The lease addendum also provided that payment of rent was to begin after approvals from the Town of Parsippany were obtained. [ibid]

14. Miller advised FAWBS in the Spring of 2018 that all issues with the Town had been resolved and that the additional rent would be paid starting in September.

**The Settlement Agreement**

15. The Settlement Agreement [Exhibit B] negotiated between PLAINTIFF and DEFENDANT called for a stated amount to be paid monthly based on a schedule set forth in the Agreement. The interest rate was set at 1% above DEFENDANT's commercial lending rate.

16. Certain relevant provisions in the Agreement are summarized as follows:

17. ¶1 Capital One acknowledged that Scerbo had a mortgage on the property located at 3460 Route 46 in the amount of $1,911,447.

18. ¶3 FAWBS was to make payments directly to Capitol One rather than disbursing funds to Binder. Capital One affirmed that FAWBS is not liable for the Neil Binder Judgment and is not a debtor of the Lender.

19. ¶3 Scerbo permitted Capitol One to have priority in payment over her monthly mortgage debt service payment received from FAWBS.

20. ¶4 A Waterfall provision defined the priority of payments to be made by FAWBS from funds it received.

4

21. ¶7 FAWBS recognized Capitol One's right to a continuing lien and security interest in PLAINTIFF's stock ownership in FAWBS.

22. ¶8 Scerbo agreed to subordinate her mortgage to the debt due to Capitol One. Furthermore, Capital One acknowledged that Scerbo has no personal liability on account of the Neil Binder Judgment.

23. ¶10 FAWBS would provide financial information to Capitol One as well as obtain consent for large capital improvements.

24. ¶12 FAWBS was to pay Capital One the Binder distributions which Capital One would apply to reduce the amounts due under the Neil Binder Judgment.

25. In addition, the Settlement Agreement defined conditions for default and remedies [¶11&12], sets forth conditions for reconciliation of differences between the parties [¶17(c)] and limited jurisdiction to New York State [¶17(f)].

**Catastrophic Event**

26. During the course of negotiating the Settlement Agreement, PLAINTIFF told DEFENDANT that FAWBS expected to receive additional rental income from Miller in September 2018. Given this information, DEFENDANT demanded and PLAINTIFF accepted an increase in the monthly payment to be made to DEFENDANT beginning in October 2018.

27. The additional rental income from Miller was critical to PLAINTIFF's ability to support the Settlement payments. All money being received by FAWBS at that time was allocated to real estate taxes due in December. This additional money was specifically earmarked for the Settlement Agreement.

28. Contrary to expectations, Miller delayed making the additional rental payments until February 2019.

29. The failure to receive these payments had an adverse, unexpected and significant consequences to PLAINTIFF.

30. The Google definition of "catastrophe" as provided by Oxford Learners Dictionary, the World's leading dictionary publisher, is "an event causing great and often sudden damage or suffering; a disaster." [Exhibit G Google Definition Oxford]

31. Had PLAINTIFF attempted to make payments as prescribed in the Settlement Agreement, it would have had a momentous deleterious effect on PLAINTIFF, resulting in substantial economic harm and possibly bankruptcy.

32. The Settlement Agreement provides for the following:

> In the event the Paul Miller Auto Group ("Paul Miller"), the tenant of the property owned by FAWBS in Parsippany, New Jersey, is unable to pay rent due to a catastrophic event, the Monthly Payments due in connection with the Agreement will consist of interest only for a period of 180 days. Once Paul Miller catches up on its rent obligations, the suspended principal amortization payments will also catch up in the same proportion. Under no circumstance will the amortization suspension affect the Maturity Date of the Agreement. [Settlement Agreement §17(f)]

33. In the context of PLAINTIFF's issues, the nonpayment by Miller was of sufficient importance to qualify as a catastrophic event. PLAINTIFF contacted DEFENDANT and sent an email advising DEFENDANT of its intention to invoke this provision of the Settlement Agreement to defer payment [Exhibit H Email correspondence with Capital One].

34. DEFENDANT sent a default letter as required under Section 11 of the Settlement Agreement on December 20, 2018 [Exhibit I Default Letter]. This provision states:

> Default. In the event of any default under the Agreement or under any or the documents executed in connection with, or relating to the Agreement or other settlement documents, The Binders shall have 60 days from the receipt of written notice of default to cure the same. A default which remains uncured for 60 days shall constitute a "Settlement Default". In the event of a Settlement Default, the terms dealing with the Settlement Amount shall be void and all sums due in connection with the Neil Binder Judgment (with credit given for payments received under the Agreement) shall become fully and immediately due and payable. [Settlement Agreement Section 11]

6

35. DEFENDANT also advised PLAINTIFF that Section 17(f) called for continuing to make a partial payment of interest. PLAINTIFF reviewed the Agreement and accepted that PLAINTIFF had made an error. Accordingly, in January 2019, less than 60 days after receiving the notice of default, PLAINTIFF notified DEFENDANT that he would immediately pay the interest that was due [Exhibit J Email correspondence]. However, DEFENDANT refused to accept PLAINTIFF's offer to make the interest payment insisting that the entire amount set forth in the Settlement Agreement was due, and unless this entire amount was received, DEFENDANT would reject any payment. DEFENDANT also rejected PLAINTIFF's multiple attempts to have a meeting to resolve the problem [ Exhibit J Email Capital One refusal].

32. After the completion of the 180-day deferral window specified in Section 17(f), PLAINTIFF made all payments including catching up on principal amortization as required, though DEFENDANT denied this was true in Court [Exhibit K Binder letter to Glas].

33. All payments were accepted by DEFENDANT. In addition, DEFENDANT continued to send monthly statements to PLAINTIFF recognizing each monthly payment and adjusting the remaining balance against the original amount stated in the Settlement Agreement of $578,235.86 [Exhibit L-1, 2, 3 Capital One Monthly Statements].

36. Rather than recognize PLAINTIFF's compliance with the Settlement Agreement, DEFENDANT initiated legal action against FAWBS in the Superior Court of New Jersey seeking to have the Court confirm a default and direct that **all** money Binder would be entitled to receive each month, not merely the amount for the Settlement Agreement, be forwarded directly to DEFENDANT [M, M-1 New Jersey Superior Court Orders].

37. Since PLAINTIFF was never named in this lawsuit, it was never able to provide any testimony in its capacity as the debtor about the events that took place. Nevertheless, the Court granted Summary Judgment to DEFENDANT, directing FAWBS to send all future distributions

7

intended for PLAINTIFF to be paid instead to DEFENDANT. The Court accepted that the statements made by DEFENDANT represented a full portrayal of the facts, which they did not. The Court stated:

> PLAINTIFF is entitled to receive **all** Binder Distributions, as the term is defined in the parties' Settlement Agreement as of December 20, 2018. And going forward until the judgment entered in PLAINTIFF's favor against Neil Binder is fully satisfied. [Exhibit M Superior Court Order MRS L 00183-19 11/13/2019 p 2].

38. FAWBS complied with the Court's order and PLAINTIFF continued to receive each month a statement from DEFENDANT which recognized those payments; the allocated interest based on 1% above DEFENDANT's prime commercial rate; and the reduced principal balance amount based on the initial opening balance of $578,235.86 [Exhibit L -1,2,3 Capital One Statements].

39. Each statement also identified the maturity date of the Settlement Agreement as December 31, 2021. [ibid]

40. The Settlement Agreement states that the ending balance (after adjustment for all credits) on December 31, 2021 was due and payable at that time. DEFENDANT's November Statement, which is the last one sent to PLAINTIFF, shows that the balance due at that time was $406,634 [Exhibit N Capital One November statement].

41. In order to comply with the Agreement terms, FAWBS decided to sell the Dealership Property. The closing on this sale took place on March 25, 2022 [Exhibit Q Closing Statement on Property Sale]. Though the due date for payment was at the end of 2021, DEFENDANT accepted a continuation of payments and the application of the same rate of interest until the closing occurred [Exhibit O Capital One Payoff Computation].

42. PLAINTIFF sent a payoff schedule to DEFENDANT showing an ending balance to be paid to DEFENDANT [Exhibit N Neil Binder Payoff Computation]. DEFENDANT disagreed. DEFENDANT demanded that all money relating to the dispute be placed in escrow. PLAINTIFF's

8

attorney confirmed that funds were escrowed equal to the amount DEFENDANT claimed was due plus an additional $12,832 representing 90 days interest [Exhibit O-1 Letter confirming escrow].

43. PLAINTIFF called DEFENDANT seeking to resolve the amount in dispute. During this discussion, PLAINTIFF explained that his financial condition was precarious and that he might be forced to enter into bankruptcy if the funds demanded by DEFENDANT were withheld from PLAINTIFF. No agreement was reached.

44. However, DEFENDANT chose to use the information about PLAINTIFF's possible bankruptcy filing to demand that **all funds** PLAINTIFF was entitled to receive be placed in escrow [Exhibit R Email from Glas]. Concerned that DEFENDANT would hold up the closing, PLAINTIFF acquiesced to this demand [Exhibit R-1 Email confirming escrow]. Thus, PLAINTIFF was unable to access even those funds which were greater than the disputed amount to assist him in resolving other creditor claims.

**Jurisdiction and Standing**

45. DEFENDANT's action in filing a lawsuit against FAWBS in New Jersey Superior Court was contrary to the express language in Section 17(f) which directs that all matters relating to the Agreement must be brought "solely and exclusively" in the State and Federal Courts of New York. Section 17(f) of the Settlement Agreement states:

> Governing Law, Jurisdiction and Forum Selection Clause. This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to principles of conflicts of law. Further, the Binders and Lender agree all matters involving this Agreement and all documents executed in connection with the foregoing shall be brought solely and exclusively in the State or Federal Courts of New York. [Exhibit B Settlement Agreement ¶ 17(f)]

46. The Settlement Agreement also specifically states "FAWBS is not liable for the Neil Binder Judgment and is not a debtor to the Lender" [Exhibit B Settlement Agreement page 3 §3 last paragraph].

9

47. By taking an action outside the mandated area of jurisdiction and by filing a motion against FAWBS, DEFENDANT breached its obligations under the Settlement Agreement.

**Estoppel**

48. The doctrine of Estoppel by Silence arises from an "obligation where there is an intention to mislead or at least a willingness that the other should be deceived." [Wiser v Lawler 189 US 260 (1903)].

49. The Settlement Agreement specifically identifies $578,235.86 as the amount that must be paid [Exhibit B Recitals]. The Superior Court of New Jersey's Summary Judgment Order also identifies that sum as the PLAINTIFF's full obligation [Exhibit M New Jersey Superior Court Summary Judgment]. Any payments made by PLAINTIFF were used solely for the purpose of paying interest and reducing the open balance of its obligation to DEFENDANT [Exhibit O Order Granting Summary Judgment and Related Relief Agreement Doc L-183-19 ¶5].

50. PLAINTIFF insists that the New Jersey Superior Court did not have jurisdiction to hold Binder in noncompliance with the Settlement Agreement. Furthermore, the duties identified for FAWBS in the Settlement Agreement are managerial and administrative only. They do not extend to the status of the obligation including making a determination that PLAINTIFF's debt was in default. PLAINTIFF was always in compliance with the Agreement terms and a Court of competent jurisdiction has never determined otherwise [Exhibit O Summary Judgment Order and Reconsideration Order].

51. DEFENDANT confirmed PLAINTIFF's compliance with the Settlement Agreement by its continued acceptance of payments and the issuance of monthly statements showing a commensurate reduction in the balance [Exhibit K Capital One Statements].

52. All the amounts conform to the sums set forth in the Settlement Agreement.

53. PLAINTIFF is therefore estopped from claiming this was not the correct amount due.

**Good Faith and Fair Dealing**

54. It is a settled principle in New York law that "all contracts imply a covenant of good faith and fair dealing in the course of performance" [511 West 232 Owners v Jennifer Realty Co. 98 NY 2nd 144, 153 (2020)]. DEFENDANT violated this requirement.

55. The Settlement Agreement calls for amicable conversations between the parties to resolve any ambiguities. In addition to the violations previously described, DEFENDANT exhibited a contentious attitude and failed to engage in honest and sincere conciliatory discussions which the Settlement Agreement expressly called for:

> (c) Construction. The parties hereto agree the terms and language of this agreement were the result. of negotiations between the parties and as a result there shall be no presumption that any ambiguities in the Agreement shall be resolved against either party. Any controversy over the construction of this Agreement shall be decided neutrally, in light of its conciliatory purposes, and without regard to events or authorship or negotiation. [Exhibit B Settlement Agrmnt Section 17 (c)]

56. PLAINTIFF expressed a desire to work out its differences. DEFENDANT thereby prevented a "neutral" solution to the controversy [Exhibit P emails buy Binder and Capital One].

**Damages**

57. The closing statement on the sale of the Dealership Property shows the net cash proceeds to be given to FAWBS was $1,966,224.28 [Exhibit Q Closing Statement on Sale of Dealership Property]. The 50% ownership associated with PLAINTIFF's position would have resulted in a distribution to PLAINTIFF of $983,112.14. Thus, after payment of PLAINTIFF'S remaining obligation of $381,005.00 to DEFENDANT, PLAINTIFF would have received $602,107.14 which PLAINTIFF intended to use to address creditor issues.

58. PLAINTIFF engaged in discussions with DEFENDANT seeking a resolution of their differences. During this conversation, PLAINTIFF expressed concern that an inability to obtain

11

the funds that were allocated to PLAINTIFF would create severe financial distress and force PLAINTIFF to file for bankruptcy.

59. After being advised of PLAINTIFF's contemplation of filing for bankruptcy, DEFENDANT contacted PLAINTIFF's attorney and demanded that the entire amount of PLAINTIFF's proceeds from the sale be put in escrow [Exhibit R and R-1 Demand for all funds due Binder to be put in Escrow]. DEFENDANT's behavior and its threat of legal action forced DEFENDANT to accept PLAINTIFF's demand for fear that DEFENDANT would hold up the closing on the sale of the Dealership Property [Exhibit S email confirmation all Binder funds be held in escrow].

60. DEFENDANT's demands are vengeful acts intended to punish PLAINTIFF. PLAINTIF had informed certain creditors, including its Landlord, that funds would be forthcoming from this sale of the Dealership Property to resolve open balances. With PLAINTIFF unable to deliver on its assurances, the risk of eviction, judgments and foreclosure resulted in PLAINTIFF's need to file for bankruptcy. Therefore PLAINTIFF has been materially damaged. The extent of this damage is subject to determination by the Court.

**Conclusion**

The terms of the Settlement Agreement as well as established law of Estoppel justify PLAINTIFF's contention that the amount due to DEFENDANT of $381,005 is the proper payoff balance. The bad faith actions of DEFENDANT in failing to abide by the terms of the Settlement Agreement as well as engaging in litigation that it knew was improper based on specific language in the Agreement should result in a rejection by the Court of DEFENDANT's claims and authorize the immediate release of escrow funds.

61. Plaintiff seeks the following relief

62. Count 1: PLAINTIFF seeks to have the Court affirm its position and direct that the amount to be paid to DEFENDANT shall be $381,005 which is the balance outstanding derived PLAINTIFF by DEFENDANT.

63. Count 2: PLAINTIFF seeks damages to be determined by the Court for the vengeful actions of DEFENDANT which directly resulted in DEFENDANT being material harmed and filing for bankruptcy.

Date  03/28/22

Neil Binder
Mailing Address for Service
401 East 34th Street
Apt N29C
New York, N.Y.  10016
neiljeffreybinder@gmail.com
917-747-3780